Michele Anderson-West (ISB No. 6488)
michele@stavroslaw.com
STAVROS LAW P.C.
8915 South 700 East, Suite 202
Sandy, Utah 84070
Tel: (801) 758-7604
Fax: (801) 893-3573

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DAVID BOREN,<br><br>　　　　　　　Plaintiff,<br><br>v.<br><br>BATTELLE ENERGY ALLIANCE, LLC, a Delaware limited liability company,<br><br>　　　　　　　Defendant. | Case No.<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL**<br><br>Filing Fee $400 |

Plaintiff David M. Boren, by and through his counsel, and as a cause of action against Defendant Battelle Energy Alliance, LLC, alleges and complains as follows:

**JURISDICTION AND VENUE**

1. This is an action brought pursuant to the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*; the Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e, *et seq.*; and the Idaho Human Rights Act, Idaho Code § 67-5901, *et seq.*

2. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1332 1343, and 1367.

3. Venue is proper in the United States District Court for the District of Idaho, Eastern

|   |   |
|---|---|
|   | Division, pursuant to 28 U.S.C. § 1391(b) because the claims arose in this judicial district. |
| 4. | Dr. Boren timely filed a charge of discrimination with the Idaho Human Rights Commission ("IHRC") and the Equal Employment Opportunity Commission ("EEOC") in or around September 2017, and obtained a right to sue letter on June 3, 2019. |

## PARTIES

| | |
|---|---|
| 5. | Plaintiff David M. Boren, MD ("Dr. Boren") is a male citizen and of the United States of America, who, at all times relevant hereto, was a resident of Idaho Falls, Idaho. |
| 6. | Defendant Battelle Energy Alliance, LLC ("Defendant" or "BEA") is a Delaware limited liability corporation with its principal place of business located near Idaho Falls, Idaho. BEA operates the Idaho National Laboratory ("INL"), near Idaho Falls, Idaho, under contract with the U.S. Department of Energy. |
| 7. | At all times material to this Complaint, BEA regularly employed fifteen or more persons, and was engaged in an industry affecting commerce, bringing BEA, within the ambit of Idaho Code §§ 18-7301 and 67-5901, *et seq.*; and 42 U.S.C. § 12111. |

## FACTS COMMON TO ALL COUNTS

| | |
|---|---|
| 8. | In or around March 2016, Dr. Boren did a two-week clinical rotation at BEA as a post medical school resident at the Rocky Mountain Center for Occupational and Environmental Health Residency Program (the "Program") at the University of Utah. |
| 9. | Dr. Boren spent time his time during the clinical rotation working with the INL Site Occupational Medicine Director, Stewart Curtis, MD ("Dr. Curtis"). |
| 10. | At the conclusion of the clinical rotation, Dr. Boren received a positive evaluation from Dr. Curtis. Among other things, the evaluation stated that Dr. Boren had a "great command |

of internal medicine and neurology," "[h]e interacted very well with the team," and "he was a pleasure to work with." Dr. Curtis also wrote that he "hope[d] [Dr. Boren] applies to the INL later this year or early next year when we will have a physician vacancy!"

11. In or around October 2016, Dr. Boren graduated from the Program at the University of Utah and subsequently applied for the physician job at BEA at the request of BEA.

12. On or about November 23, 2016, BEA provided Dr. Boren with a written offer of employment to work as an Occupational Physician under Dr. Curtis in the Occupational Physician in the Occupational Medicine Program department ("OMP"). The employment offer was contingent on Dr. Boren on, among other things, a background check and a post-offer medical examination.

13. Dr. Boren accepted the offer and provided BEA with extensive documentation and written information, including records related to his medical conditions. Dr. Boren disclosed to BEA his multiple medical conditions, including General Anxiety Disorder, Seizures, and Attention Deficit Hyperactive Disorder.

14. On or about December 8, 2016, BEA's physician, Christopher S. Riley, MD, reviewed Dr. Boren's comprehensive medical questionnaire and related documents. Following the medical evaluation, Dr. Riley cleared Dr. Boren to start working.

15. Several days after the medical examination, an HR representative notified Dr. Boren that he was cleared to start working.

16. On or about December 11, 2016, Dr. Boren disclosed to Dr. Curtis that he has ADHD, epilepsy and general anxiety disorder.

17. On or about January 23, 2017, Dr. Boren started working for BEA as a physician in the

Occupational Medical Program at INL. He was supervised by both Dr. Curtis and Dr. Mangan.

18. Initially, Dr. Boren did non-clinical work while he waited for the Idaho Medical Board ("IBOM") to issue his medical license, which he received on or about March 8, 2017.

19. On or about March 1, 2017, Dr. Boren voluntarily went to meet with a counselor at the Employee Assistance Program ("EAP") because, in part, he knew BEA offered this confidential service to employees.

20. At this meeting, an EAP psychologist, Allison Clark, PhD, provided Dr. Boren with an EAP Disclosure Statement, reviewed it with him, and assured him that information discussed was confidential and would be released to anyone without his permission, expected in a few limited exceptions where, for example, information created concerns he was likely to harm someone or a "clear national security risk."

21. Based on Dr. Clark's assurances of confidentiality, Dr. Boren openly discussed his medical conditions, medications, and sexual orientation.

22. Dr. Boren subsequently met with Dr. Clark on February 15th and 16th. During these meetings Dr. Boren discussed concerns he had about offensive jokes by co-workers regarding homosexuality and individuals in a protected class. He also told Dr. Clark that he complained to Dr. Curtis about such jokes and made suggestions to address and discourage such offensive comments.

23. In or around the middle of March 2017, Dr. Boren again expressed concerns to Dr. Curtis about the "workplace environment" following inappropriate comments directed at individuals in a protect group. Dr. Boren also suggested that Dr. Curtis address the matter

with the staff to avoid such comments offending employees.

24. In or around the beginning of May 2017, Dr. Boren expressed his concerns to the Director of Nurses, Deanna Hansen, related to her offensive jokes regarding homosexuality and Hispanics.

25. On or about May 30, 2017, Dr. Curtis met with Dr. Boren to discuss a performance letter of expectation. Dr. Curtis explained that BEA's legal department and the ESH&Q Division Head, Carol Mascarenas, required him to issue the letter.

26. Among other things, the letter stated that Dr. Boren must "always" have a chaperone that is the same gender as the patients/employees "who are dressed down."

27. Dr. Boren is not aware of any other employee or provider who had the chaperone policy mentioned in a letter of expectation; rather INL announced the policy to a large group of employees. In or around September 2017, Dr. Boren learned that BEA learned that he might be homosexual.

28. The letter also stated that BEA still expected to promote Dr. Boren to be the designated HRP physician by September 2017.

29. That same day, Dr. Boren received a documented verbal warning regarding use of approved medical forms and to timely complete medical records. The document also stated that "this is an issue of conforming with Company policy and not due to issues of clinical competence."

30. Neither of the aforementioned documents raise any concerns about Dr. Boren's ability to provide medical care to patients or that BEA had any concerns about patient safety.

31. From December 2016 through July 2017, Dr. Boren regularly communicated with Dr.

Curtis and others without anyone suggesting he was not qualified or capable of performing his job responsibilities.

32. On or about August 9, 2017, Dr. Curtis and Dr. Mangan described the perceptions they had (along with others at BEA) related to Dr. Boren's medical conditions. This information was disclosed to BEA as part of his extensive medical examination.

33. Dr. Curtis and Dr. Mangan repeatedly inquired about Dr. Boren's medical history and disabilities. They also attempted to diagnose actual and/or perceived medical conditions and told Dr. Boren what medications he should and should not be taking, he seemed disassociated during exams, perceived impairment from prescription (e.g., amphetamines), and concerns regarding epilepsy.

34. Dr. Boren told Dr. Curtis and Dr. Mangan that he had medical conditions that affect his life.

35. Dr. Curtis and Dr. Mangan also asked him to voluntarily agree to work with Southworth Associated, but then threatened, among other things, he would be investigated by IBOM if he did not agree.

36. As part of the voluntary agreement, Dr. Boren's supervisors wanted him to sign an agreement that effectively gave Southworth Associates full control over Dr. Boren's medical care, completely waive any right to keep his medical care confidential, and allow Southworth to discuss (without any restrictions) his medical care and conditions with sponsors. Dr. Curtis stated he would be a sponsor and would be in continual contact with the healthcare providers and provide input on what he wanted.

37. The agreement stated that he must sign an "irrevocable release" allowing medical providers

to directly communicate medical care to Southworth Associates and required Dr. Boren to waive his rights to all legal representation or information would be disclosed to IBOM.

38. One or two days later, Dr. Boren told Dr. Curtis that he did not want them managing his medical care since they supervised him at work.

39. Dr. Boren also told Dr. Curtis and others (including HR) that he felt like they were discriminating against him for actual and/or perceived disabilities.

40. Dr. Curtis, Dr. Mangan and BEA immediately took adverse action against Dr. Boren after expressing the above concerns to Dr. Curtis and Dr. Mangan.

41. On or about August 11, 2017, Dr. Boren complained to HR that emailed HR complaining about BEA disclosing to others that he was a "homosexual" and also that he believed INL planned on terminating female employees in violation of the law.

42. On or about August 11, 2017, Dr. Curtis notified Dr. Boren he could not to return to work. Dr. Boren was not given a formal letter or meaningful explanation as to why he was placed on leave.

43. On or about August 14, 2017, HR informed Dr. Boren that he was on paid administrative leave while INL conducted a so-called "security investigation" because of allegations he had possibly misuse of Government property. These allegations were false and retaliatory.

44. In the days and weeks that followed, Dr. Boren complained to HR (Mark Halubar, Shelley Wray), Carol Mascarenas (Division Head), that he being forced to discuss his medical conditions and medications with his supervisors, and that BEA was discriminating and retaliating against him on the basis of his sexual orientation and disabilities (actual and/or perceived). These complaints were communicated verbally and by email.

45. As he expected, on or about August 28, 2017, Dr. Boren learned that he was the security review cleared Dr. Boren of the allegations. Upon learning he was cleared, Dr. Boren complained to BEA management and HR that the security investigation was retaliatory and that he believed BEA was discriminating against him because of actual and/or perceived disabilities.

46. In or around September 2017, Dr. Boren learned that Dr. Mangan filed a complaint with the Idaho Board of Medicine ("IBOM"). Dispute this discriminatory and/or retaliatory act, Dr. Boren has an unrestricted license to practice medicine in Idaho.

47. In the beginning of September 2017, Dr. Boren learned that BEA "expanded" the security review because of alleged patient complaints, but was not provided any information.

48. On or about September 21, 2017, Dr. Boren complained about harassment on the basis of his sexual orientation and discrimination based on an actual or perceived disability.

49. On or about October 12, 2017, Dr. Boren came to INL because Employee Relations wanted to discuss its findings regarding his discrimination complaints. To his surprise, rather than a meaningful discussion about the findings with Employee Relations, Dr. Boren was introduced to a security investigator who proceeded to interrogate Dr. Boren for more than four hours.

50. In or around October 2017, BEA informed Dr. Boren that it had "retained an outside medical authority to review the findings from this investigation and offer INL a recommendation as to whether [he] should be permitted to continue to provide patient care to INL employees."

51. The outside medical authority was Dr. Michael Ardaiz, Chief Medical Officer for the U.S.

Department of Energy.

52. On or about November 9, 2017, Dr. Ardaiz recommended that Dr. Boren not be returned to patient care because he was not competent and presented a danger to patient safety.

53. At no time did Dr. Ardaiz meet with Dr. Boren and based his recommendations on one-sided, biased summary of the security investigator's subjective and purported findings.

54. On or about November 14, 2017, BEA terminated Dr. Boren's employment for "failure to meet performance expectations."

## COUNT ONE
### Violation of the Americans with Disabilities Act – Disability Discrimination

55. The preceding paragraphs are incorporated herein by reference.

56. Dr. Boren was an employee of BEA within the meaning of the ADA, 42 U.S.C. § 12111(4).

57. At all times relevant hereto, BEA was a covered entity within the meaning of the ADA, 42 U.S.C. § 12111(5), 12112(b).

58. At all times relevant hereto, Dr. Boren was disabled within the meaning of the ADA in that he had a disability, a record of a disability or was regarded as having a disability that substantially limited major life activities within the meaning of the ADA, 42 U.S.C. § 12102(1).

59. The major life activities limited by Dr. Boren's disabilities included, among other things, his ability to focus and relax.

60. At all times relevant hereto, Dr. Boren was qualified to perform the essential functions of his employment with BEA with or without reasonable accommodation.

61. The ADA prohibits discrimination against individuals because of their disability.

62. BEA knew of Dr. Boren's disabilities, his record of disability, or regarded him as disabled.

63. BEA took adverse employment action against Dr. Boren and discriminated against him by, among other things, disciplining his for minor issues, repeatedly harassing him about his medical conditions, disclosing his medical condition to co-workers and others, demanding an improper medical exam, initiating a security investigation, and terminating his employment.

64. BEA took adverse employment actions against Dr. Boren based on his disabilities.

65. As a direct and proximate result of BEA's actions and/or failure to act, Dr. Boren has suffered and will continue to suffer a loss of earnings and other employment benefits and job opportunities. Dr. Boren is thereby entitled to general and compensatory damages, such amount to be proven at trial as well as any other equitable remedies available to him.

66. BEA's conduct was malicious and oppressive, and done with a reckless disregard for Dr. Boren's federally protected rights, for which Dr. Boren is entitled to punitive damages pursuant to 42 U.S.C. § 1981(a).

## COUNT TWO
### Violation of the Americans with Disabilities Act – Retaliation

67. The preceding paragraphs are incorporated herein by reference.

68. The ADA prohibits employers from retaliating against an employee who engage in protected activity.

69. Dr. Boren's complaints to Dr. Curtis, Shelley Wray, Mark Halubar, Carol Mascarenas, and others, constitute protected activity under the ADA.

70. BEA retaliated against Dr. Boren by, among other things, initiating a security investigation, expanding the investigation, and terminating his employment.

71. As a result, Dr. Boren is entitled to recover damages for lost wages, and other benefits

along with compensatory damages in an amount to be proven at trial.

72. BEA's conduct was malicious and oppressive, and done with a reckless disregard for Dr. Boren's federally protected rights, for which Dr. Boren is entitled to punitive damages pursuant to 42 U.S.C. § 1981(a).

## COUNT THREE
**Violation of the Americans with Disabilities Act – Hostile Work Environment**

73. The preceding paragraphs are incorporated herein by reference.

74. Dr. Boren is a qualified individual with disabilities.

75. Dr. Boren was subjected to verbal or physical harassment by BEA because of his disabilities. Such harassment includes, but is not limited to, the following: Subjecting Dr. Boren to a security investigation; pressuring him to disclose information about his medical conditions; threatening him with board complaints/investigations; and subjecting him to intimidating behavior, such as interrogations.

76. BEA's verbal and physical harassment of Dr. Boren based on his disabilities created a hostile work environment.

77. BEA's conduct towards Dr. Boren was unwelcome.

78. BEA's conduct was sufficiently severe and pervasive to alter the terms and conditions of Dr. Boren's employment and to create an abusive, discriminatory and hostile work environment.

79. Dr. Boren perceived the working environment to be abusive, hostile and/or offensive.

80. A reasonable person in Dr. Boren's situation would have perceived the working environment to be abusive, hostile and/or offensive.

81. Plaintiff sustained several adverse tangible employment actions, including being formally

investigated, without any prior corrective action or direction, being subjected to abusive and harsh treatment, being given disciplinary action, being issued an extremely poor annual review, and being terminated.

82. As a direct and proximate result of BEA's actions and/or failure to act, Dr. Boren has suffered and will continue to suffer a loss of earnings and other employment benefits and job opportunities. Dr. Boren is thereby entitled to general and compensatory damages, such amount to be proven at trial as well as any other equitable remedies available to him.

83. BEA's conduct was malicious and oppressive, and done with a reckless disregard for Dr. Boren's federally protected rights, for which Dr. Boren is entitled to punitive damages pursuant to 42 U.S.C. § 1981(a).

### COUNT FOUR
### Violation of Title VII of the Civil Rights Act of 1964 – Gender Discrimination and Retaliation

84. The preceding paragraphs are incorporated herein by reference.

85. BEA violated Title VII of the Civil Rights Act of 1964, as amended, by subjecting Dr. Boren to gender discrimination.

86. Dr. Boren performed his job with BEA satisfactorily.

87. BEA initiated its investigation into Dr. Boren based upon the fact that he was homosexual, made stereotypical remarks about him, and denied him equal terms and conditions of employment.

88. Plaintiff sustained several adverse tangible employment actions, including being investigated, being subjected to abusive and harsh treatment, and being given disciplinary action.

89. As a direct and proximate result of BEA's actions and/or failure to act, Dr. Boren has suffered and will continue to suffer a loss of earnings and other employment benefits and job opportunities. Dr. Boren is thereby entitled to general and compensatory damages, such amount to be proven at trial as well as any other equitable remedies available to him.

90. BEA's conduct was malicious and oppressive, and done with a reckless disregard for Dr. Boren's federally protected rights, for which Dr. Boren is entitled to punitive damages pursuant to 42 U.S.C. § 1981(a).

## COUNT FIVE
### Violation of the Idaho Human Rights Act – Disability Discrimination & Retaliation

91. The preceding paragraphs are incorporated herein by reference.

92. BEA violated the Idaho Human Rights Act, Idaho Code § 67-5901, et seq., by subjecting Dr. Boren to disability discrimination based on his disabilities, as set forth above.

93. As a direct and proximate result of BEA's actions and/or failure to act, Dr. Boren has suffered and will continue to suffer a loss of earnings and other employment benefits and job opportunities. Dr. Boren is thereby entitled to general and compensatory damages, such amount to be proven at trial as well as any other equitable remedies available to him.

94. BEA's conduct was malicious and oppressive, and done with a reckless disregard for Dr. Boren's rights, for which he is entitled to punitive damages pursuant to Idaho Code § 67-5908.

## ATTORNEYS' FEES

95. As a further and direct result of BEA's actions and/or failures to act, Dr. Boren has been compelled to retain the services of counsel, and thereby incurred, and will continue to incur, costs, expert witness fees, and attorney fees which should be required to be paid by BEA

pursuant to Idaho Code §§ 12-120 and 12-121; 42 U.S.C. § 1988(b); and 42 U.S.C. § 2000e-5(k).

## DEMAND FOR JURY TRIAL

Plaintiff David Boren, MD, demands trial by jury as to all issues triable to a jury in this action.

## PRAYER FOR RELIEF

Wherefore, Dr. Boren seeks judgment against BEA as follows:

1. For compensatory and general damages as well as statutory available damages in an amount as shall be proven at trial and any available equitable remedies;

2. Punitive damages;

3. For prejudgment and post-judgment interest, as applicable, at the highest lawful rates;

4. For attorneys' fees pursuant to statute and costs of suit; and

5. For such other and further relief as the Court deems just and proper.

Dated this 31st day of August, 2019.

_____/s/_____
Michele Anderson-West
STAVROS LAW P.C.